## SOUTHERN PAC. CO. v. McKINLEY.
### No. 3162.

Court of Civil Appeals of Texas. El Paso.
March 7, 1935.

Rehearing Denied March 28, 1935.

Del W. Harrington, of El Paso, for appellant.

Sydney Smith and E. B. Elfers, both of El Paso, for appellee.

HIGGINS, Justice.

Robert McKinley, administrator of the estate of F. J. McGinley, deceased, brought this suit against the Southern Pacific Company to recover damages for the death of McGinley, the plaintiff suing for the use and benefit of the surviving wife and minor children of the deceased. McGinley, an experienced and capable switchman, was killed about 3 a. m. December 19, 1931, in the switchyards of appellant at Tucumcari, N. M. The action is governed by the Federal Employers' Liability Act (45 USCA §§ 51–59). The tracks in the yard are numbered 1 to 9. They run east and west. No. 9 is the most northerly track. Upon the occasion in question, McGinley was a member of a switch crew composed of the engineer, Coulter, fireman, Gorman, foreman, Moore, switchmen, Andricks and McGinley. Lamb and Shacklett were members of another crew working in the yard at the same time. Two tracks ran diagonally across the yard in a northwesterly and southeasterly direction called the lead tracks. These were the tracks used for passing from one switch track to another. McGinley was the man following the engine. The movement of the engine was controlled by McGinley's lantern signals. The engine with one empty box car and one loaded box car moved northwestwardly over one of the lead tracks to No. 9 track and cleared the switch a short distance. The engine was facing west with the two cars east of it. McGinley threw No. 9 switch lining up No. 9 track. He then gave a signal to move to the east, the signal also indicating the movement would proceed considerable distance. He stopped to the north a few feet from the track. It was his duty to board the easterly car at its northwest corner as it passed him. He undertook to do so, was thrown between the two cars, dragged some distance, mangled, and killed. The engine halted east of the body. No one saw McGinley when he fell between the cars. After the accident, McGinley's extinguished lantern was found a few feet north of the north rail of track 9. The plaintiff's theory is that it was the duty of the engineer to begin the eastward movement at a moderate speed so that McGinley could safely board the car as it passed him, but instead of so doing the engineer immediately speeded the movement so that as the first car passed McGinley it was running too fast for safety in boarding, and as McGinley boarded such car the excessive speed swung him around the corner, between the cars, and caused him to fall between the rails.

Another theory is that under a rule of the appellant it was the duty of the engineer (who was on the north side of the engine cab) to keep a constant lookout for McGinley's lantern light and, when same disappeared from view, to immediately stop the movement. It was alleged the engineer failed to keep such lookout; that if he had done so he would have observed the disappearance of the light and stopped the cars in time to prevent injury.

The jury found:

1. On the 19th of December, 1931, in the switchyards of defendant, at Tucumcari, in attempting to get upon a moving car being switched by the defendant, McGinley was thrown or caused to fall underneath the wheels of the car or cars being propelled by defendant's engine.

2a. The death of McGinley was not the result of an unavoidable accident.

2. The engineer operating the engine at the time McGinley sustained the injuries resulting in his death was operating same at an excessive rate of speed.

3. The operation of such engine at such rate of speed was negligence.

4. Such negligence was a proximate cause of McGinley's death.

5. Prior to the time of the injury in question, the light from the lantern carried by McGinley disappeared from the view of the engineer, Coulter.

6. Upon the disappearance of said light, it was negligence on the part of the engineer to fail to seek to bring the said engine to a stop.

7. Such negligence was a proximate cause of McGinley's death.

8. McGinley did not come to his death through a risk or danger ordinarily incident to the employment in which he was engaged at the time of his death.

9. At the time he attempted to get upon the moving cars, McGinley did not know, nor in the exercise of ordinary care in the performance of his duty should he have known of the

excessive rate of speed of such car, and appreciated the danger incident to getting on same under such conditions.

Issues 10, 11, and 12 were findings that Mrs. McGinley and her children were damaged by McGinley's death and assessing damages at $25,000, apportioning the same among Mrs. McGinley and the children.

Upon such findings, judgment was rendered in plaintiff's favor.

### Opinion.

The suit was filed December 13, 1933. The amended petition upon which the trial was had was filed June 15, 1934. It is urged the suit is barred by limitation because the original petition was subject to general demurrer and the amended petition was filed more than two years after the cause of action occurred.

█ It may be the cause of action was so defectively·stated in the original petition as to subject the same to general demurrer. Conceding such to be the case, the original petition was sufficient to stay the statute of limitations.

28 Tex. Jur., Title Limitation of Actions, §§ 97 and 120; Seaboard Air Line Ry. v. Renn, 241 U. S. 290, 36 S. Ct. 567, 60 L. Ed. 1006; Pope v. Ry. Co., 109 Tex. 311, 207 S. W. 514, and cases there cited.

It is also asserted the amended petition is subject to general demurrer because it shows the death of McGinley was caused by a risk which he assumed. Other assignments complain of the refusal of a peremptory charge.in appellant's favor upon the same theory as to the evidence upon the issue of assumed risk; also upon the theory that the cause of McGinley's fall is conjectural and actionable negligence therefore not shown. These questions may be considered together. If the judgment is supported by the evidence, the petition is sufficient.

█ We regard the evidence, particularly the testimony of the witnesses Lamb and Shacklett, as amply supporting the plaintiff's theory of the cause and manner of McGinley's death and that it was not caused by a risk which he had assumed. The testimony upon the controlling facts is sharply contradicted, but it was the province of the jury to pass upon such conflicts.

Appellee in his brief has correctly summarized the evidence in his behalf tending to show the cause and manner of McGinley's death and pertinent to the issue of assumed risk. We quote such summary as follows:

"J. D. Lamb, a witness for plaintiff, testified that on the night of December 18th and the early morning of December 19th, 1931, he was working as a fireman on an engine switching in the yards of defendant company at Tucumcari, New Mexico. That he knew F. J. McGinley who was at the time a trainman being used in yard service that night on account of shortage in yardmen. That witness was on his engine which was standing on the east lead to the west yards between tracks numbers 6 and 7 and headed in a northwesterly direction. That shortly before the accident in which McGinley lost his life, witness saw McGinley and switchman Koyiol together on the ground between the leads near where Number 8 track of the east yards joined the lead to those yards. That these men were at the time lighting cigarettes and McGinley then walked north to Number 9 track and crossed to the north side of the track near the switch from Number 9 track to the west lead of the east yards. That at this time the engine with which McGinley was working was standing on Number 9 track headed west with two box cars, one loaded and one empty behind it, the east end of the east car being some fifteen feet west of the switch leading from Number 9 track to the west lead of the east yards. That McGinley gave a back-up signal by means of the lantern he was carrying, giving a signal that indicated that the movement would be for some distance. Following this signal there was a rapid back-up movement of the engine and two cars, the engine finally stopping just east of the west end of the caboose track. Witness had been an engineer and fireman for fourteen years, had worked in the yards at Tucumcari, was familiar with the engine making this movement on track Number 9 and could tell by the exhaust as well as by observation that the movement was rapid. The exhaust indicated that the throttle was almost fully open. There was a slight down grade from west to east in the yards at Tucumcari and on track Number 9 which made movements from west to east easier to make than when moving west. That when movement had stopped witness saw Mr. McGinley's body between the rails of track Number 9 close to the north rail about eight to fifteen feet in front and to the west of the engine. It was approximately two hundred feet from the point where witness saw McGinley give the back-up signal to the point where his body lay. Mr. McGinley's lantern was found lying on its side and not burning on the ground some eight or ten feet practically due north of

where witness saw him give the back-up signal. The lantern had been lighted when this signal was given.

"Ed Shacklett, a witness for plaintiff, testified to having twenty years railroad experience. Seven or eight of which had been in yard switching and a little more than four years of which had been switching experience in the Tucumcari yards. He had known McGinley for a number of years prior to his death and was working in the yards at the time he was killed. Witness was working with the same engine that fireman Lamb was on. Shacklett says he and Ralph Moore, the foreman of the crew McGinley was working with, were standing on the ground between the two leads about on a line with Number 5 track, when the engine and two cars pulled up onto Number 9 track from the west lead to the east yards. Mr. McGinley lined Number 9 switch, gave a back-up signal and the engine and two cars started the east movement on track Number 9. Witness could tell from the exhaust of the engine that the engineer was working almost a full throttle of steam which would indicate he was going to kick the car. Witness could see McGinley on the north side of Number 9 track, could see his light under the lead car as it passed him up to the point where he would get on the car if he intended to cut it. That McGinley should, in the proper performance of his duties, have gotten on the rear end of the lead car by catching the hand-hold or ladder and putting his foot in the stirrup on the side of the car near the rear end. Witness saw McGinley's light under the car up to the point where this ladder was on the car and the light then went out of sight. The witness says that eight to ten miles per hour is a safe speed in switching operations at night to enable switchmen to safely get on and off moving cars. Witness had in the course of his experience as a switchman had occasion many times to get on cars under the same circumstances as those under which McGinley was getting on. If the movement is rapid the effect is to whirl or spin a switchman around the corner of the car and cause him to fall between and under the cars. If the car is moving at a safe rate of speed and the switchman for any reason fails to get a safe hold, he will fall outside the car and rail.

"Witness was watching the movement of this engine and two cars as they backed up and estimates the speed at the time McGinley attempted to get on as between fifteen and eighteen miles per hour.

"Witness was standing back at such a distance from the engine and cars that he could judge the speed of the movement.

"Witness says that he saw McGinley's light move along with the rear end of the lead car as he did and should in making an effort to get on. And again describes McGinley's movements in getting on. Witness estimates the distance he saw McGinley run in getting on, at from eight to ten feet.

"Witness says that a switchman right up against a moving car cannot judge the speed of its movement as accurately as when he is standing away from it some distance.

"Ralph Moore, a witness for defendant, and who was foreman of the yard engine with which McGinley was working that night, testified that a switchman getting on a moving car cannot tell exactly how fast the car is moving. He must exercise his best judgment. The one who really knows how fast he is going is the engineer. An engine and two cars moving east on track Number 9 will pick up pretty fast.

"George H. Koyiol, a witness for defendant, and who was foreman of the engine that witness Shacklett and Lamb were working with, describes the movement much as the other witnesses. He says that when cars are backing up as these cars were, a good switchman will always stay off the lead end of the car and that the customary thing to do is to get on the rear end of the lead car where he can perform his duties. That a man getting on the car at the point McGinley did, would have his lantern in his left hand or on his left arm. This witness says that he saw McGinley at a point ten or twelve feet east of Number 9 switch when he attempted to get on the car and when he again saw him, McGinley was hanging by his right hand on the hand-hold on the west end of the lead car with only the upper half of his body showing above the coupling. This was at a point sixty-five to seventy-five feet east of Number 9 switch. Witness did not see the lantern when he saw McGinley between the cars, and could not tell whether McGinley was dragging.

"W. A. Thrasher, a witness for defendant and a car repairer who was in the yards between the leads and south of Number 9 track when the movement started on Number 9 track, says he could see a lantern near Number 9 switch on the north side of the track and as the lead car was passing could see the light for a short distance reflected under the car. Then it looked as though the light went down off the car and witness

could not see it any more. Witness could not see whether the light fell off or someone had stepped off, but did see a light go down off the car. When the cars and engine had gone by, witness walked up to where he had seen the light disappear and found an unlighted lantern lying on the ground north of Number 9 track."

The testimony of these witnesses is sufficient to support the findings that the engineer was running at an excessive and negligent speed at the time McGinley undertook to board the car. The presence of the extinguished lantern a few feet north of the point where McGinley undertook to board the car is a very material fact.

From the testimony quoted, it is a most reasonable deduction that when McGinley undertook to board the car, the excessive speed at which it was moving, whirled him around the corner of the car, such whirling movement slinging the lantern from McGinley's left arm or hand; that McGinley's hold upon the car was rendered insecure and he was thereby caused to fall to the ground between the rails. We regard the testimony as supporting the view that McGinley's fall was caused in this manner.

As to the contention that McGinley, as a matter of law, assumed the risk incident to boarding the car while it was moving at a dangerously rapid speed, we need only refer to Chesapeake & O. R. Co. v. De Atley, 241 U. S. 310, 36 S. Ct. 564, 566, 60 L. Ed. 1016. In that case the plaintiff, a brakeman, attempted to board the engine of an approaching train moving at a speed which rendered it unsafe to attempt to board the engine. In holding the issue of assumed risk to be for the jury, Justice Pitney said:

"It is insisted that the true test is not whether the employee did, in fact, know the speed of the train and appreciate the danger, but whether he ought to have known and comprehended; whether, in effect, he ought to have anticipated and taken precautions to discover the danger. This is inconsistent with the rule repeatedly laid down and uniformly adhered to by this court. According to our decisions, the settled rule is not that it is the duty of an employee to exercise care to discover extraordinary dangers that may arise from the negligence of the employer or of those for whose conduct the employer is responsible, but that the employee may assume that the employer or his agents have exercised proper care with respect to his safety until notified to the contrary, unless the want of care and the danger arising from it are so obvious that an ordinarily careful person, under the circumstances, would observe and appreciate them. * * *

"We are unable to concur in the view that there was no question for the jury. Whether the risk was an extraordinary risk depended upon whether the speed of the train was greater than plaintiff reasonably might have anticipated; and this rested upon the same considerations that were determinative of the question of the engineer's negligence. If the jury should find, as in fact they did find, that the speed of the train, was unduly great, so that the risk of boarding the engine was an extraordinary risk, the question whether plaintiff assumed it then depended upon whether he was aware that the speed was excessive, and appreciated the extraordinary danger; or, if not, then upon whether the undue speed and the consequent danger to him were so obvious that an ordinarily prudent person in his situation would have realized and appreciated them. * * * Conceding the force of the reasoning, we are bound to say that, in our opinion, it cannot be said, as matter of law, to be so incontrovertible that reasonable minds might not differ about the conclusion that should be reached. We therefore hold that the question of assumption of risk was one proper for submission to the jury. * * *"

This case is decisive in support of the view that upon the present facts the issue of assumed risk was for the jury to determine. See, also, Davis v. Preston, 118 Tex. 303, 16 S.W.(2d) 117.

Upon the other ground of negligence relied upon we again quote, as substantially correct, the evidence summarized in appellee's brief:

"J. D. Lamb, having fourteen years experience in the engine service of defendant company at Tucumcari, testified that the rules of the company and the instructions given employees in schools of instruction conducted by the company, required an engineer operating an engine at night to stop whenever he could not for any reason see the light carried by the switchman controlling his movements. That in the movement being made in the course of which McGinley was killed, the light in the hands of McGinley was the one engineer Coulter was required by the rules of the company to watch, and that when such light went out or Coulter for any reason could not see the same, it was Coulter's duty to immediately stop. Mr. Lamb testified that schools of instruction had from time to time been conducted by the defendant company at Tucumcari, New Mexico, in which Mr.

Nichols was the instructor. That during such schools of instruction he had seen Mr. Nash, assistant superintendent, and Mr. Hull, engine foreman, present. That in these schools rules were interpreted and enginemen and yardmen were instructed with reference to same and that his statement of what the rules required an engineer to do was based on instructions so given.

"R. E. Moore, the foreman of the yard engine with which McGinley was working on the night he was killed, testified that the rules of the company required an engineer operating an engine at night in switching operations, to constantly watch the light in the hands of the switchman who was giving signals and to stop the engine when the light disappeared or went out. That such had been the instructions he had heard given in the schools of instruction conducted by the defendant company.

"Engineer Coulter, who was operating the switch engine at the time McGinley was killed, admits that among other rules of the company governing enginemen, there was the following rule in force: · 'Enginemen must be alert in all matters pertaining to safety and while running must keep a constant and vigilant lookout and carefully note all signals.' Engineer Coulter in his testimony admits that the major part of the movements in the yards in switching operations at night are controlled by lantern in the hands of the switchman who is giving the signal.

"Reference to the map or plat of the yards which is before this court will show that the distance from the switch on track Number 9 leading to the west of the east yards to the switch on track Number 9 leading to the caboose track is approximately fifteen and one-half inches. The map is drawn to a scale of twenty feet to the inch. The distance between these two switches was therefore approximately three hundred and ten feet. Evidence heretofore set out under counter proposition four shows that when the movement began the east end of the lead car was some ten or fifteen feet west of the lead switch off Number 9 track and that when the movement stopped the pilot of the engine was about even or possibly a little east of the switch off Number 9 track to the caboose track. Evidence previously set out shows that when McGinley attempted to get on the car he was ten or fifteen feet east of the lead switch and when the movement had stopped his body lay between the rails of Number 9 track some eight to fifteen feet west of the pilot of the engine. Taking the maximum of fifteen feet

as being the correct distance to be subtracted at each end of the movement, we have a distance of two hundred and eighty feet to account for.

"The witness Thrasher who first found the lantern, and Mr. Lamb who saw where the lantern was on the ground both place it some ten feet due north of the point where Mr. McGinley attempted to get on the car. The witness Koyiol in testimony heretofore quoted says he saw Mr. McGinley on the west end of the car at a distance which he estimates as being from sixty-five to seventy-five feet east of the lead switch on track Number 9. Mr. Koyiol further testified that the first mark on the rail was a brown spot where leather had been squeezed against the rail and that he was told that Mr. McGinley's shoe was found near this spot on the rail. Koyiol places this spot on the rail at a distance of from forty-five to fifty feet east of where he saw McGinley hanging on the car and he further estimates that this spot was approximately seventy-five feet from where the body lay.

"Ed Shacklett testified that he examined the ground and rails and that from evidence on the ground and rails it appeared that Mr. McGinley had been dragged approximately one hundred feet before there was any evidence of his having been cut up.

"The witness Andricks found the shoe between the rails and puts it at a point about one hundred and twenty feet west of the body. This same witness says there were flesh and blood marks on the rail about half a car length west of the engine.

"Engineer Coulter on cross examination admitted that he operated the engine at least one hundred and fifty feet after he could not see the light and admits that he dragged Mr. McGinley a distance of from one hundred and fifty to two hundred feet and cut him up.

"The witness Moore testified that the engineer stopped the engine and two cars within a distance of twenty-five feet after he gave the signal to stop.

"The witness Gorman, the fireman on the engine, also claims that the engine and two cars were stopped within a distance of twenty-five feet."

■ This testimony warrants the conclusion that the engineer did not keep a lookout for McGinley's lantern as the rule required him to do; that if he had done so, he could have stopped in twenty-five feet after the lantern disappeared from his view and before McGinley was caught and run over by the wheels.

Appellant also questions the sufficiency of the evidence to support the amount of damages awarded. We regard this as without merit.

Affirmed.